* At appellant's request, and without opposition from appellee, the case is submitted for decision on the briefs and record alone.

Mary Joyce ZBLEWSKI,
Plaintiff-Appellant,

v.

Richard S. SCHWEIKER, Secretary of the Department of Health & Human Services, Defendant-Appellee.

No. 82–1836.

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 16, 1983 *.

Decided April 11, 1984.

David J. Worzalla, McKelvey, Worzalla & Klessig, S.C., Stevens Point, Wis., for plaintiff-appellant.

Krista M. Ralston, Asst. U.S. Atty., and John R. Byrnes, U.S. Atty., Madison, Wis., Steven J. Plotkin, Dept. of Health & Human Services, Chicago, Ill., for defendant-appellee.

Before WOOD, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiff-appellant brought suit under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Secretary's final decision denying claimant's [1] applications for disability benefits and Supplemental Security Income (SSI). The district court declined to reverse the Secretary's determination.

■ Claimant, a 49-year-old truck driver, filed applications for disability benefits and SSI in 1977 alleging that he had been disabled and unable to work since December 4, 1975; on that date he had been exposed to carbon monoxide from a leaky exhaust system in the truck he was driving, and this triggered symptoms that lead to a diagnosis of heart disease. The applications were denied initially and upon reconsideration. After a hearing before an Administrative Law Judge (ALJ) at which the reports of several doctors were admitted and plaintiff, claimant, his representative, and a vocational expert testified, the ALJ concluded that claimant was not disabled within the meaning of the Social Security Act; although claimant was unable to return to work as a truck driver, he retained the residual functional capacity to perform sedentary work. The Appeals Council approved this decision on May 3, 1978. After receiving notification that claimant had died April 3, 1978, following surgery for replacement of an aortic valve, the Appeals Council reconsidered the matter, but concluded that there was no basis for vacating its previous decision.[2] The ALJ's decision

---

1. The applicant for benefits was the wage-earner Norman Zblewski. Mary Joyce Zblewski was substituted as plaintiff after her husband's death. "Plaintiff" will refer to Mrs. Zblewski, and "claimant" to her husband.

   Title II disability benefits are payable to a beneficiary. Title XVI SSI benefits are payable to a surviving spouse only if she is herself eligible for SSI benefits. See 20 C.F.R. § 416.542(b) (1981).

2. The district court, in a careful opinion, noted that "this case is particularly troublesome because the claimant died shortly after his administrative hearing of cardiac arrest following surgery for an aortic valve replacement. In hindsight, and to a layperson, the claimant's death tends to bear out his own description of his physical impairments and cast doubt on the doctors' assessments of his residual ability to work at a sedentary job." We too are mindful of the pitfalls of reviewing this record with

thus stood as the Secretary's final determination.

According to claimant's testimony, his physical problems included the following: dizzy spells with nausea which occurred at least two times a week and lasted for several minutes; shortness of breath at rest as well as after exertion; constant headaches and pain in the left rib cage; numbness and weakness in his left arm, hand, and fingers; poor vision; nervous tension; and chronic diarrhea. He could stand for only 15 minutes and sit for only 45 minutes before experiencing dizziness. He occasionally helped his wife wash dishes, but otherwise did very little housework. He had no hobbies and watched television often, but was unable to read more than a paragraph at a time. He could walk three-and-a-half blocks to the post office, but had been advised by his doctor not to do any lifting. Claimant also testified: that he was unable to sit during an eight hour work day; that he could not do any fine work with his hands due to his poor vision, but could see to do soldering on larger items; and that he could not do piece work or work under pressure because of his

nervous tension. He took prenestrol, oreopin, valium, and darvon every day, and nitroglycerine as necessary for shortness of breath and chest pain. Claimant's wife testified that he had a seizure whenever he tried to exert himself; that she had to help him out of the bathtub; and that the treating physician, Dr. Robert H. Bickford, had told her always to accompany her husband because of his seizures.

The medical evidence, consisting of hospital records and of two physicians' reports and their responses to inquiries from the Social Security Administration, spans the period from December 1975 to February 1978. The reports indicate that claimant had a serious and deteriorating heart condition, with eventual aortic valve replacement surgery anticipated. (There was some suggestion that the replacement valve was a new device, and it would be better to delay non-emergency surgery until there was more experience with it.) The physicians reported at various times that claimant could handle work less strenuous than over the road truck driving, and that he was totally incapacitated and would remain so until after surgery.[3]

20:20 hindsight, and limit our review, as we must, to the record.

**3.** The medical report from Dr. Bickford stated that as of December 1975, the final diagnosis of claimant's condition was arteriosclerotic heart disease, inferior wall ischemia, runs of ventricular tachycardia (*i.e.*, abnormally rapid ventricular heart rhythm), and active duodenal ulcer. Dr. Dean A. Emmanuel performed a heart catheterization and coronary arteriogram on claimant on March 9, 1976. Dr. Emmanuel's final diagnosis, based on these tests, was aortic insufficiency with a dilated left ventricle and minimal elevation of pulmonary artery pressure. On March 19, 1976, Dr. Emmanuel noted that claimant had had occasional chest pain but no dyspnea (*i.e.*, difficult or labored breathing); he advised that further medical intervention was not warranted until claimant showed evidence of increasing left ventricular strain or congestive heart failure; and he further advised claimant not to return to his job as a truck driver, but rather to seek another job where he would not be required to do heavy lifting. In a report dated July 15, 1976, Dr. Bickford reviewed claimant's medical history and his testing by Dr. Emmanuel, and stated that it was his opinion that claimant could participate in a rehabilitation work program that did not involve heavy

labor. As of August 3, 1976, Dr. Emmanuel indicated that claimant continued to have chest pain and shortness of breath after slight exertion; that these symptoms were relieved by rest and nitroglycerine; and that claimant was unable to work at that time due to shortness of breath of cardiac origin. On September 23, 1976, Dr. Emmanuel noted that claimant still experienced episodes of shortness of breath, weakness, and faintness about two to three times per month; that he had some anginal pain on intercourse; that his EKG was less favorable; that his condition had remained the same; and that there was no need to proceed with surgery at that time. On March 23, 1977, Dr. Emmanuel noted that claimant had experienced shortness of breath and chest pain two or three times a week; that he required nitroglycerine; and that he was a suitable candidate for aortic valve replacement. Dr. Bickford reported that he examined claimant again on February 21, 1977; that open heart surgery was contemplated for replacement of his aortic valve; that his condition required a reduction in his physical activity; that he advised claimant not to return to his job as a truck driver or to any other occupation that required physical activity; and that he was totally incapacitated for an indefinite period of time. In two later reports, dated November 30,

The only question before the district court, and on appeal, is whether there is substantial evidence in the record taken as a whole to support the Secretary's conclusion that claimant was capable of sedentary work. Plaintiff argues that substantial evidence is lacking because the ALJ could have reached his decision only by ignoring all of claimant's uncontradicted testimony concerning his subjective experience of pain and physical and emotional disability, as well as certain statements from both Dr. Bickford and Dr. Emmanuel. As an indication that subjective evidence was ignored, plaintiff points to the ALJ's use of two hypothetical questions propounded to the vocational expert. The ALJ first asked the expert whether claimant could perform gainful work if he had all the pain and limitations he claimed, and the expert replied that claimant could not. The ALJ then asked whether claimant could work if he was unable to stand or walk for prolonged periods and was subject to anginal attacks upon exertion, but was able to sit for long periods and had no problems with vision, tension or numbness in his fingers. The expert was explicitly instructed to exclude from consideration claimant's ulcer and the testimony concerning nervousness. There was also no mention of any effects of medication. (Both hypotheticals assumed claimant's age, education, and work experience.) To this second question, the vocational expert responded that claimant would be capable of sedentary work (e.g., electronics assembly), and that such work was available in the area.

In finding that claimant was not disabled, the ALJ apparently relied on the answer to the second hypothetical, implicitly rejecting the evidence that claimant was incapable of sedentary work. The magistrate, to whom the district court referred the case, recommended reversal of the ALJ on the ground that he had failed to explain why he rejected all the evidence consistent with a finding of disability. In rejecting this recommendation, the district court noted that a reviewing court's task is much easier when the ALJ articulates his reasons for rejecting or accepting particular testimony. The court nevertheless concluded that because the ALJ recited the subjective evidence consistent with the first hypothetical, he had not ignored it, and would be presumed to have rejected it on credibility grounds; there was some record evidence, e.g., a clinic report that claimant's vision was corrected by glasses, that provided a basis for questioning claimant's credibility. (This does not account for the rejection of certain of the physicians' reports.) It is on the assumption that claimant's testimony must have been rejected for good reason—a not unreasonable assumption given the guidance heretofore furnished to the district courts—that we cannot agree with the district court.

■■ While we must defer to the credibility determinations of the fact-finder, we must be sure that the ALJ has indeed made a credibility determination. This conclusion follows from the definition of "substantial evidence" set forth in *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), in which the Supreme Court vacated a decision enforcing a Board order, finding it insufficient that the evidence supporting the Board's order was substantial when considered in isolation. The Court held that the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 488, 71 S.Ct. at 465. While there may be strong grounds upon which the ALJ rejected claimant's evidence in this case, as the district judge presumed, we cannot say on the basis of the record that such a conclusion is self-evident. In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is

1977 and February 15, 1978, Dr. Bickford reiterated his opinion that claimant was totally incapacitated by his aortic insufficiency and should not be allowed to work until after his open heart surgery. Claimant died of cardiac arrest six days after undergoing aortic valve replacement surgery.

"substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons (*e.g.*, lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review. As the Third Circuit put it in *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981), when the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."

This court is not unmindful of the heavy and unique burden placed upon ALJs in Social Security Act cases. We emphasize that we do not require a written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.

In the absence of such articulation here, the judgment of the district court is reversed with instructions to remand the case to the Social Security Administration for further proceedings consistent with this opinion.[4]

REVERSED AND REMANDED.

**4.** In the event that the ALJ decides that claimant would have been entitled to SSI benefits, he should take evidence to determine whether claimant's wife, the plaintiff, is herself entitled to receive payment of these benefits.